UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                     Plaintiff,                Criminal No. 17-20489

v.

                                     Honorable Terrence G. Berg

D-10 Maurice McCoy,
D-12 Teeauna White,

                    Defendants.

## **<u>Government's Response in Opposition to Defendants' Motion to Suppress Evidence (ECF No. 477)</u>**

Teeauna White's motion to suppress the contents of an iCloud account registered to McCoy's business should be denied[1]. The warrant established probable cause that the account would contain evidence related to drug trafficking, money laundering and attributes identifying the user.

Maurice McCoy and White's motion to suppress primarily documentary evidence from their California residence should also be denied. The warrant was not stale and was based upon sufficiently reliable information from confidential sources.

---

[1] In her request for relief, White seeks to suppress the iCloud contents. (ECF No. 477, PgID. 3491. The government understands therefore that McCoy (who would have to assert his expectation of privacy in the iCloud) has not joined in this part of the motion.

Ultimately, the exclusionary rule does not apply, and the agents acted in good faith.

McCoy and White cannot meet their high burden to justify a *Franks* hearing because the affiants neither omitted material information nor included false information in the affidavits.

## Facts

Maurice McCoy was the leader of an extensive drug trafficking organization (DTO) with distribution hubs in multiple cities in the United States. Couriers, facilitators, and kilogram quantity customers alike reported to McCoy. In just two of his stash houses in Detroit and Baltimore, agents seized 52 kilograms of narcotics. (Ex A: iCloud Warrant ¶¶ 7, 15; Exhibit E: Residential Warrant ¶¶ 17, 25). Agents stopped couriers twice and seized seven more kilograms. (Ex A: iCloud Warrant ¶¶ 9, 17; Exhibit E: Residential Warrant ¶¶ 19, 27).

As with most DTOs, McCoy's drug operation generated significant cash, including more than $260,000 that law enforcement seized. (Ex A: iCloud Warrant ¶¶ 10, 12, 15; Exhibit E: Residential Warrant ¶¶ 20, 22, 25). And as with most large-scale drug dealers, McCoy needed to hide the source of his income, so he and his significant other, Teeauna White, used bank accounts to launder some of the drug proceeds by structuring cash deposits. For instance, separate $9,500 cash deposits were made in Baltimore (one of McCoy's distribution hubs) into three of

White's accounts on the same day in July 2017. (Ex A: iCloud Warrant ¶¶ 30-31, 33; Exhibit E: Residential Warrant ¶¶ 44-46, 48). McCoy and White used the proceeds of their drug trafficking to purchase expensive assets including luxury vehicles and their California residence. (Ex A: iCloud Warrant ¶¶ 38-40; Exhibit E: Residential Warrant ¶¶ 53-54, 56).

In 2019, federal magistrate judges in two different judicial districts authorized search warrants that White and McCoy now challenge. Agents first obtained a warrant in the Eastern District of Michigan to search an iCloud account (mg.mealclique.ent@gmail.com) tied to McCoy's recording and promotional business, Money Gang Meal Clique (MGMC). Agents found incriminating photos, videos, and evidence of the DTO's illegal activity and money laundering scheme in the iCloud account.

About a month later, agents obtained a warrant in the Central District of California to search McCoy and White's California residence for primarily documentary evidence of their crimes. Agents seized mostly records related to McCoy and White's businesses and several electronic devices. (Gov. Sealed Ex. 1: DEA-6: June 4, 2019 Search Pala Loma Residence).

## Argument

**I.      The affidavits established probable cause.**

A warrant is supported by probable cause when "given all of the circumstances set forth in [an] affidavit…there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462, U.S. 213, 238 (1983).

Probable cause is a "practical, nontechnical conception" based on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231.  It is a "common-sense decision, based on the totality of the circumstances, not line-by-line scrutiny of the affidavit." *United States v. Brown*, 857 F.3d 334, 339 (6th Cir. 2017). And an affidavit is "judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Once a magistrate has determined the existence of probable cause, that decision should only be reversed if it was arbitrarily made. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v.*

*Leon*, 468 U.S. 897, 914 (1984). This deferential standard "further[s] the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984). The affidavits here, as issued by each independent magistrate should not be suppressed. Each affidavit established McCoy's long term drug trafficking, White's involvement in the laundering of drug proceeds, and an explanation of the affiants' belief that evidence of those crimes would be stored in both the iCloud and McCoy and White's residence.

### A. The informants provided detailed first-hand information and corroborated each other.

 Information from a confidential informant may supply probable cause when, given the totality of the information in the affidavit, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) quoting *Illinois v. Gates,* 462 U.S. 213, 244 n. 13 (1983). And although "'reliability,' and 'basis of knowledge' are highly relevant in assessing the value of an informant's tip, these elements should not be understood as 'entirely separate and independent requirements to be rigidly exacted in every case.'" *Id.* Instead, they are closely related issues and "a deficiency in one of these areas 'may be compensated for, in determining the overall reliability of [an informant's] tip, by a

strong showing as to the other, or by some other indicia of reliability." *Smith*, 182

F.3d at 478.

Here, the affidavits for both the iCloud and Pala Loma searches included

information from five confidential informants about McCoy's drug trafficking

operation. All were members of his organization who provided details of its inner

workings that were laid out in the affidavits. (Ex A: iCloud Warrant ¶ 21; Ex E:

Residential Warrant ¶ 34). When confidential informants have a significant basis

of knowledge—as all five did given their membership in McCoy's organization—a

warrant affidavit can establish probable cause without an independent statement of

their reliability. *United States v. Hines*, 885 F.3d 919 (6th Cir. 2018) (even though

the affidavit did not address the informants' reliability in detail, it still established

probable cause by devoting a significant amount of attention to the informants'

basis of knowledge). On that alone, the magistrates properly credited the

informants' information.

What is more, the affidavits here established the informants' reliability.

Corroboration makes up for an informant's lack of history of reliability. *United

States v. Jackson*, 470 F.3d 299 (6th Cir. 2006) (although the affidavit did not

name or attest to reliability of the informant, probable cause was supplied by

corroborating evidence). While these affidavits did not lay out a history of the

informants' reliability as some do, this "lack of averment," as the defendants

describe it, is not fatal to a finding of reliability. Indeed, "[a]ffidavits are not required to use magic words, nor does what is obvious in context need to be spelled out." *United States v. Allen*, 211 F. 3d 970, 975 (6th Cir. 2000) (en banc). Instead, reliability—even for a new informant—can be established through corroboration (and other means). *United States v. Jackson*, 470 F.3d 299 (6th Cir. 2006). And here, the informants were extensively corroborated.

First, although none of the informants were aware that the others were cooperating, the information they provided about McCoy's DTO was consistent. In other words, the informants corroborated each other. As courts have found, even for informants with no history of reliability, "the receipt of consistent information from two separate sources is a form of corroboration." *United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013); *United States v. Nielsen*, 371 F.3d 574, 580 (9th Cir. 2004) (the reliability of information from sources with no history of reliability "is buttressed by the similarity of their accounts"); *United States v. Taylor*, No. 1:07CR68, 2007 WL 1115194, at *7 (N.D. Ohio Apr. 13, 2007), aff'd, 471 F. App'x 499 (6th Cir. 2012) ("the confidential informants corroborate each other by providing similar information.").

Second, much of the information provided by the informants was further corroborated by the DEA through their investigation, as evidenced by the following chart:

| Description | DEA-1 | DEA-2 | DEA-3 | DEA-4 | DEA-5 | Independently corroborated by law enforcement |
|---|---|---|---|---|---|---|
| McCoy/Loc was the DTO leader | X | X | X | X | X | |
| DTO went by Money Gang Meal Clique/ MGMT | | X | X | X | X | X |
| McCoy operated Another Level Studio | X | X | X | X | | X |
| DTO distributed in multiple cities | X | X | X | X | X | X |
| McGlory/ Bug was a DTO member | X | X | | | | X |
| Anthony Oliver/AD was a DTO member | | | X | X | X | X |
| Artis/Rich Rico was a DTO member | X | | X | X | X | |
| Tyler Jackson a DTO member | | | | X | X | X |
| Joyce Haynes was a courier | X | X | | | | X |
| Ocean Francis was a courier | | X | | | | X |
| McCoy traveled for DTO operations | | | | X | X | |
| White dated McCoy and knew details about the DTO | | X | X | | | |

Therefore, the sources' information was sufficiently corroborated to be

"deemed to be accurate and reliable." (Ex. A: iCloud Warrant ¶ 21; Ex E:

Residential Warrant ¶ 34).

## B. DEA-1 and DEA-2 were reliable

McCoy and White's arguments to attempt to undermine DEA-1 and DEA-2

as reliable sources of information are neither factually accurate nor complete.

### DEA-1

McCoy and White's claim that DEA-1 lied during the investigation and the

government failed to bring that lie to the magistrates' attention in these affidavits is

fatally flawed. As evidence of their claim, McCoy and White point to a different,

earlier affidavit in which the government disclosed a lie by an informant identified

as DEA-1[2]. But McCoy and White confuse the sources of information; the

informant is not the same individual in the cited warrant, and the error is apparent

from a plain reading of each affidavit.

DEA-1 in the iCloud and the residential search warrant was an anonymous

source who agents never fully identified. (Ex. A: iCloud Warrant ¶ 22; Ex E:

Residential Warrant ¶ 35). DEA-1 in the affidavit McCoy and White cited was a

---

[2] In their motion McCoy and White cite to SW 47 (Gov. Sealed Ex. 6) and list an issued date of 9/7/18. (ECF No. 477, PgID. 3493). But SW 47 was issued on 1/15/19. The government believes McCoy and White meant to cite to SW 38, which was issued on 9/7/18 and from which they quote ¶ 11 of that warrant.

known informant "who agents met with in person," as clearly stated in the cited affidavit. DEA-1 in the cited affidavit lied on one occasion and that lie was disclosed to the magistrate in the other warrant. DEA-1 in the iCloud and Pala Loma affidavits did not. Accordingly, the affiant did not fail to make the significant disclosure McCoy and White would have the Court believe.

**DEA-2**

DEA-2 was not forthcoming about one thing: McCoy and his role as the leader of the organization. DEA-2 initially attempted to deflect culpability from McCoy to "Bug," co-defendant James McGlory. But after further questioning, DEA-2 admitted McCoy was the leader (which every other informant likewise acknowledged). McCoy and White's argument that DEA-2 was not reliable because DEA-2 "was untruthful more than once" is not accurate. (ECF. No. 477, Page ID.3493). And DEA-2's initial description alone does not negate DEA-2's credibility when (1) the informant admitted McCoy was the leader; (2) agents corroborated all the other information DEA-2 provided; and (3) the initial statement was disclosed to the magistrate.

DEA-2 identified Joyce Haynes as a courier. (Ex. A: iCloud Warrant ¶ 23; Ex E: Residential Warrant ¶ 36). So did DEA-1 and Jackson-based customer Anthony Oliver. (Ex. A: iCloud Warrant ¶¶ 11, 22; Ex E: Residential Warrant ¶¶ 35, 21). The investigation confirmed that fact when agents determined (1) Haynes

departed from Detroit the same morning they searched the Novi condo where they found all the drugs and arrested co-conspirator Andre Scott, who was the listed point of contact on Haynes's flight reservation; *and* (2) they tracked her from Las Vegas to the Indianapolis Greyhound bus station where they arrested her in possession of three kilograms of cocaine. Haynes was destined for Baltimore, another drug distribution hub for the organization where they later seized drugs and arrested more DTO members. (Ex. A: iCloud Warrant ¶¶ 7-9, 13-15; Ex E: Residential Warrant ¶¶ 17-19, 23-25). DEA-2 also identified all those cities as distribution locations (Detroit, Jackson, Las Vegas, Indianapolis, and Baltimore). (Ex. A: iCloud Warrant ¶ 23; Ex E: Residential Warrant ¶ 36).

DEA-2 named [Ocean] Francis as a courier, which agents confirmed after they saw her travel with other DTO members, including McCoy's confidant, Tyler Jackson, to Baltimore. The agents then arrested her with Jackson a month later and seized two kilograms from her backpack. (Ex. A: iCloud Warrant ¶¶ 17-18; Ex E: Residential Warrant ¶¶ 27, 29).

The Pala Loma affidavit included, DEA-2 and DEA-3's identification of S.F. as someone who booked flights for people when they traveled on behalf of the DTO. (Ex E: Residential Warrant ¶¶ 36, 37). The affidavit detailed three flights S.F. paid for—McCoy's from Las Vegas to Detroit in 2015, and two for Haynes to Indianapolis in 2016 and from Detroit to Los Angeles in 2017. (Ex E: Residential

11

Warrant ¶ 42). McCoy's travel to Detroit in 2015 was consistent with DEA-4 and DEA-5's information that initially McCoy would travel to distribute drugs, including to Michigan, but that his travel decreased around 2015 when he recruited others to do the work for him, further corroborating DEA-2's information about Foster's role. (*Id.* ¶¶ 39-40). Agents further confirmed McCoy and Foster's association after they determined McCoy communicated with a phone subscribed to Foster. (*Id.* ¶ 81).

DEA-2, just like DEA-1, DEA-3, and DEA-4 identified Another Level studio in California that McCoy operated, though the other informants elaborated that members gathered there, including according to DEA-1 to discuss drug trafficking. (Ex. A: iCloud Warrant ¶¶ 22-24; Ex E: Residential Warrant ¶¶ 35-38). The questionable finances associated with the bank account for the business— including a $9,500 cash deposit in distribution hub Baltimore the same day there were deposits in three more accounts associated with McCoy and White— corroborated not just the existence of the business, but its relationship to McCoy's illegal activity. (Ex. A: iCloud Warrant ¶ 31; Ex E: Residential Warrant ¶ 44).

DEA-2 told agents that McCoy's co-conspirators—not just music artists— were associated with the moniker "money gang clique" or "money gang meal clique." (Ex. A: iCloud Warrant ¶ 23; Ex E: Residential Warrant ¶ 36). This was corroborated by DEA-3's familiarity with the reference, DEA-4's statement that

they were the names used for the drug organization, DEA-5 knowing the names were a way McCoy and his members identified their drug trafficking enterprise, and that members of the drug conspiracy owned jewelry with the MGMC moniker, like a necklace McCoy displayed in a social media photo. (Ex. A: iCloud Warrant ¶¶ 24-25, 27; Ex E: Residential Warrant ¶¶ 37, 38, 40, 71). DEA-2's assertion that this moniker was associated with illegal activity was also corroborated by the fact that a "Money Gang Meal Cliq" placard was displayed in the organization's Baltimore stash location with 18 kilograms of drugs and more than $100,000. (Ex. A: iCloud Warrant ¶ 15; Ex E: Residential Warrant. ¶ 25). And as detailed in the Pala Loma affidavit, McCoy's own communications corroborated DEA-2's information, including his use of the MGMC Instagram handle to communicate with DTO member Deonte Artis about what agents interpreted was a discussion about distributing drugs. (Ex E: Residential Warrant ¶¶ 73-74).

The government disclosed DEA-2's initial statement minimizing McCoy's involvement, so there is no question the judges could factor that information into their review. Given the plethora of other details DEA-2 told agents that they corroborated, one comment that DEA-2 retracted does not completely negate the value of the informant's information.

## C. The iCloud affidavit established a connection between the illegal activity and the account.

The iCloud affidavit established probable cause to believe that for years McCoy ran a large, interstate drug conspiracy; that McCoy used couriers to move drugs, and nominees, including White, to launder money; that McCoy put assets, accounts, and phone numbers in White's name or the name of his organization, Money Gang Meal Clique (MGMC); that McCoy, or White, or both used some of those accounts to launder money; and that records of McCoy's money laundering and drug conspiracy would be found in the mg.mealclique.ent@gmail.com iCloud account. This is more than is necessary. White and McCoy's argument that the iCloud affidavit failed to sufficiently establish White's connection to the conspiracy and failed to account for possible innocent alternatives to her involvement is factually incorrect. But more importantly, this argument misses the point. The iCloud affidavit is sufficient because it established probable cause to believe that evidence of drug trafficking and money laundering would be found in the MGMC iCloud account.

As set forth in the affidavit, MGMC was synonymous with McCoy's DTO, not just recording or promoting music. Each source of information identified in the affidavit described the recording studio Another Level and/or the Money Gang Meal Clique in some iteration as associated with McCoy's drug distribution. Given that, it is notable the moniker was incorporated into the username of the iCloud

account agents searched (mg.mealclique.ent@gmail.com).

The affidavit to search the MGMC iCloud account detailed the types of information related to the DTO's illegal activity that could be stored on the iCloud (Ex A: iCloud Warrant ¶¶ 49-50, 52-65). The affidavit established that the iCloud account was activated on June 15, 2017, when the DTO was actively distributing drugs to various cities. And one month before agents sought the warrant in 2019, they confirmed the account was registered in White's name to a phone number subscribed in her name at an address on N. Fillmore in Rialto, California. (*Id.* ¶¶ 47-49). It also noted McCoy used a phone subscribed in White's name, and that the phone was subscribed to the same address McCoy provided to his probation officer. (*Id.* ¶ 43).

The affidavit also established that McCoy opened a bank account in the name Moneygang Mealclique Ent. and identified White as a signor on the account. (*Id.* ¶ 30). Separately, White established and controlled the business bank account for Another Level. (*Id.* ¶ 31). And she held business bank accounts (checking and savings) for her own company, Pretty Pockets. (*Id.* ¶ 33). All the identified accounts were ultimately closed by the banks in late 2017 due to suspicious activity. (*Id.* ¶¶ 32-33). Importantly, the affidavit set out probable cause to believe that while White controlled or shared control of these accounts with McCoy, they were used to launder money for MGMC. For instance, on a single day in July

2017, someone in Baltimore (a DTO distribution hub) deposited $9,500 in cash (just under the threshold that would trigger a cash transaction report) into each account. The deposits were made less than three weeks after agents identified and searched the DTO's Detroit stash location and while the MGMC iCloud account was also active. (*Id.* ¶¶ 7, 30-31, 33, 49). Not only that, but video footage from an ATM on May 4, 2018, showed McCoy used White's personal checking account at a credit union, also when the iCloud account was active. (*Id.* ¶¶ 34, 49). Probable cause existed to believe that the financial activity was evidence of the money laundering scheme. And the affidavit specified that bank statements can be emailed and maintained in cloud storage. (*Id.* ¶ 32). Because White controlled the accounts at the same time her email address was the MGMC account, the affiant expected the statements would have been emailed to the account. (*Id.*).

In addition to the bank accounts she controlled, White owned three vehicles simultaneously—a Mercedes worth $100,000 in MGMC Ent.'s name, a Bentley worth $60,000 that she purchased with a $9,900 cash down payment (also just under the threshold that would trigger a cash transaction report), and a Cadillac Escalade that previously belonged to one of McCoy's Michigan drug distributors. (*Id.* ¶¶ 39-41). White used her identified bank accounts to make payments on the Mercedes and Bentley. (*Id.*). White titled the Escalade in her name after DTO member Andre Scott allegedly sold it to her. But, the initial sale to Scott was not

valid and Scott's sale to White occurred just after Scott was arrested and detained; his signature on the title transfer to White appeared to be forged. (*Id.* ¶¶ 41-42). And McCoy owned a Porsche which he paid $25,000 cash down and listed White as a reference. (*Id.* ¶ 38). The affidavit specified bank statements and records regarding the assets could be saved in cloud storage. (*Id.* ¶ 50). And the statements and records would be evidence of the money laundering scheme.

The affidavit was not limited to evidence of the money laundering conspiracy. White also arranged travel for members of the drug conspiracy. She did so using the internet. And, as set forth in the affidavit, records of the travel arrangements would often be saved to an iCloud account. (*Id.* ¶¶ 29, 50).

Beyond the records likely to be kept in the MGMC iCloud account, probable cause existed for more basic evidence: user attribution and contacts. Given the comingling of the recording studio, the promotional business, and the DTO's illegal activity, the association amongst DTO members and the account holder—as identified in contact information, communication in various forms (email, texts, calls), money transfers, travel records, location data, and through pictures and video—was relevant to the investigation and all likely to be stored in the iCloud. (*Id.* ¶ 50).

The defendants also make a passing reference to *Riley v. California*, 573 U.S. 373 (2014). It is unclear how they think *Riley* affects their case. The Court in

*Riley* did not examine probable cause for a warrant, indeed the case did not involve a warrant at all. Nor an email account. Instead, in *Riley*, the Supreme Court did not extend the search incident to arrest exception to cell phones and reiterated they did not hold "that the information on a cell phone is immune from search; it is that a warrant is generally required before a search." *Riley*, 573 U.S. at 376. Here, the DEA obtained a warrant. And the warrant "constrain[ed] the search to evidence of a specific crime." *United States v. Castro*, 881 F.3d 961, 965 (6th Cir. 2018). This is all that is required.

### D. The Pala Loma affidavit was not stale.

A warrant is only stale if an affidavit's information, when presented to the magistrate, no longer established a fair probability that evidence would still be found at the search location. *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). It is possible that even if a substantial amount of time had elapsed between…[the] last reported criminal activity and the issuance of the warrant, the warrant had not become stale." *Id*. Whether information in an affidavit is stale "must be determined by the circumstances of each case." *Sgro v. United States*, 287 U.S. 206, 210-211 (1932).

The Pala Loma affidavit primarily sought records and assets like jewelry—all durable, nonperishable items (not like drugs, which are easily transferrable). Agents reasonably believed records, including banks statements for Another Level,

Moneygang Mealclique Ent., and Pretty Pockets, would be stored at McCoy and White's residence, especially because the recording studio that closed had been the mailing address for Another Level and Pretty Pockets previously. (Ex E: Residential Warrant ¶¶ 44-46).  Agents also sought records related to White's personal accounts that she allowed McCoy to access and records relating to the purchase, financing, and ownership of their vehicles that were generally not supported by their reported income. (*Id.* ¶¶ 49-58, 62-64).

The Sixth Circuit has found that business records are durable and non-perishable evidence that defy claims of staleness. *Abboud,* 438 F.3d. at 574. In *Spikes* on the other hand, which McCoy and White rely on, the warrant sought illegal drugs, which are inherently distinguishable. *United States v. Spikes*, 58 F.3d 913, 923 (6th Cir. 1998). Here, the affidavit explained why drug traffickers often keep records "for long periods" at their residences or properties. (Ex E: Residential Warrant ¶ 52). Because records are durable instruments that tend to be maintained for a long time, the magistrate reasonably inferred that the items the warrant sought would be found at the search location. *See, e.g., United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008) (An issuing magistrate "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the crime and type of offense).

In *Spikes*, this Court outlined several factors to consider when analyzing staleness:

> (1) the character of the crime (chance encounter or regenerating conspiracy?);
> (2) the criminal (nomadic or entrenched?);
> (3) the thing to be seized (perishable and easily transferrable or enduring utility to its holder?);
> (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Spikes*, 158 F.3d at 923.

Examination of these factors shows the warrant was not stale when authorized by the magistrate. The character of the crime, a years' long drug and money laundering conspiracy that continued despite repeated seizures and arrests of multiple DTO members, was ongoing. The import of McCoy's ping data showed that he was consistently at the residence for 60 days before the execution of the warrant and solidified his connection with the Pala Loma residence. This despite he and White using another location as their "clean address," one where they only claim to reside and register assets, despite living elsewhere—a common practice of drug traffickers. (Ex E: Residential Warrant ¶ 82).  This information suggested an entrenched criminal using the residence as a secure base. There was no indication of movement from place to place to decrease the likelihood that evidence would be found at the location.

The suggestion that the ping data did not show evidence of continued criminal activity and the residential warrant was stale because McCoy wasn't visiting stash locations ignores the detailed facts of the investigation—McCoy stopped traveling years before as he had others do the grunt work of delivering drugs or overseeing distribution locations for him. Instead, others turned the proceeds over to McCoy, which according to DEA-5, he stored wherever he lived. (Ex E: Residential Warrant ¶¶ 39, 67). That assertion was corroborated by images on the iCloud showing McCoy in underwear in a home counting cash at a time when White had established service at the Pala Loma residence. (*Id.* ¶¶ 67-68).

The reviewing magistrate reasonably concluded the enduring items and documents (including in their electronic form) sought would be at McCoy and White's residence.

## II.   The exclusionary rule is not applicable because the officers acted in good faith.

If the Court were to find the search warrants defective, which they are not, the record taken as a whole shows the agents acted in good faith and the warrants were valid in accordance with *United States v. Leon*, 468 U.S. 897 (1984). Where police officers relied upon a search warrant, the threshold for establishing that they failed to act in good faith "is a high one, and it should be". *Messerschmidet v. Millender*, 565 U.S. 535, 547 (2012).

21

If the reviewing court is "able to identify in the averring officer's affidavit *some* connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then official reliance on [the affidavit] is reasonable." *United States v. White*, 874 F.3d 490, 496-497 (6th Cir. 2017) (citing cases) (quoting *United States v. Laughton*, 409 F.3d 744, 749-750 (6th Cir. 2005)).

The Supreme Court has stressed that the exclusionary rule is a "last resort." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). "Penalizing an officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921. To deter officers from acting in 'deliberate, reckless, or grossly negligent' disregard of the Fourth Amendment, it is not enough to find the warrant lacked probable cause. The Court must further conclude there were "no reasonable grounds for [the officer] believing that the warrant was properly issued." *Id.* at 922-923; *see also Davis v. United States*, 564 U.S. 229, 237-238 (2011)."[C]ourts presented with a motion to suppress claiming a lack of probable cause must ask whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision. Only when the answer is 'yes' is suppression appropriate." *White*, 874 F.3d at 496 (quoting *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)) (quoting *Leon*, 468 U.S. at 923). That question cannot be answered in the affirmative in this case.

The affidavits in this case were not conclusory or speculative without supporting facts. The affidavits laid out the investigative steps and extensive corroboration taken to connect the illegal activity to the iCloud account and McCoy and White to the residence and the primarily documentary evidence they sought, "provid[ing] a concrete factual link between…criminal activity, and the [account/place] to be searched." *White*, 874 F.3d at 498-499.

## III.   McCoy and White Are Not Entitled to a *Franks* Hearing

A defendant is entitled to a hearing to challenge the validity of a search warrant only if he "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [ ] the allegedly false statement is necessary to the finding of probable cause." *Franks v. Delaware,* 438 U.S. 154, 155–56 (1978).

Allegations of omissions, which is what McCoy and White's claims about "false impressions" within the affidavits amount to, will rarely justify a *Franks* hearing.  "There is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement."  *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2001). "Except in the *very rare* case where the defendant makes a strong preliminary showing that the affiant (not an informant) with an intent to mislead excluded critical

information from the affidavit, and the omission is critical to the finding of probable cause, *Franks* is inapplicable." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998) (emphasis added); *Franks v. Delaware*, 438 U.S. 154 (1978).

First, McCoy and White must show the omission resulted from a deliberate or reckless disregard for the truth. But "it will often be difficult for an accused to prove that an omission was made intentionally or with reckless disregard, rather than negligently. *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990). Second, the court must consider whether the affidavit with the addition of the omitted material would still establish probable cause. *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001).

In an effort to support their claim of the government's "intellectual dishonesty" McCoy and White offer possible alternative explanations of what the affiants fairly believed was illicit. But possible alternate explanations do not amount to omissions and do not undermine a probable cause finding. *United States v. Strickland*, 144 F.3d 412 (6th Cir. 1998). See also *District of Columbia v. Wesby*, 138 S.Ct. 577 (2018) (in assessing probable cause courts are not free to disregard a fact or factors merely because it is suspectable to an innocent explanation).

Here, even if the Court were to add McCoy and White's alternative explanations or sometimes obscure factual details to the search warrants, probable

cause would still exist. They have not met their burden for a hearing.

### A.    The financial investigation (both affidavits)

The financial investigation as documented in both affidavits showed McCoy

and White used multiple business accounts to launder drug proceeds and acquire

assets. In their efforts to criticize the investigation, McCoy and White ignore

important facts and fail to consider the totality of the circumstances as the Court is

required to do.

The financial investigation corroborated that McCoy's businesses were

inextricably intertwined with his drug trafficking. Financial activity showed

McCoy and White used their bank accounts to funnel drug proceeds. Both warrants

documented a pattern of structured deposits totaling $38,000 (made in $9,500

increments) on July 28, 2017, into all four of their business accounts in Baltimore

(one of the organization's major drug distribution hubs).  (Ex A: iCloud Warrant ¶¶

30-33; Ex. E: Residential Warrant ¶¶ 44-48). The residential search warrant

documented a fifth deposit into a third party's personal account, increasing the

total amount of laundered funds on one day to $47,500. (Ex E: Residential Warrant

¶ 48). The pattern of structuring all the deposits in less than $10,000 increments

was blatant evidence of money laundering.  (Ex. E: Residential Warrant, ¶ 49).

And due in part to this suspicious financial activity, the *banks closed* the accounts

for Another Level, Moneygang Mealclique Ent. and Pretty Pockets in 2017. (Ex A:

25

iCloud Warrant ¶¶ 32, 33; Ex. E: Residential Warrant ¶ 46). The financial activity in the accounts was not consistent with their purported business or anticipated expenses either. (Ex A: iCloud Warrant ¶¶ 30-32; Ex. E: Residential Warrant ¶¶ 44-45).

Defendants' reliance on a retired IRS agent to critique the thoroughness of the investigation of McCoy and White's money laundering scheme is unpersuasive because it ignores these facts. Equally importantly, it is not a basis upon which to grant a *Franks* hearing, because a disagreement between experts is an issue for the trier of fact to decide whose opinion to rely upon. It does not help McCoy and White meet their high burden.

Adding to the affidavit that Another Level, Moneygang Mealclique Ent, and Pretty Pockets were otherwise cash-based businesses, would not have changed the probable cause assessment of either warrant. See *United States v. Bencs*, 28 F.3d 555 (6th Cir. 1994) (commingling drug proceeds with legitimate funds will not preclude a money laundering conviction). Nor would referencing promotional Instagram posts for MGMC. McCoy and White's claim that these failures amounted to material omissions by creating a false impression of illegal activity disregards obvious evidence of money laundering.

**B.    White's purchase of flights for others (iCloud affidavit)**

In addition to the fact that White traveled with DTO members, the affidavit

noted that White purchased a one-way flight from Los Angeles to Detroit in March

2017. (Ex A: iCloud Warrant ¶ 29).  White's claim it was a material omission not

to name the DTO member in the affidavit as V.J., who was also a rapper for

MGMC, is unpersuasive given his travel to a major distribution hub only months

before agents searched the stash location there and found more than 30 kilograms

of drugs. White's argument is also premised upon incomplete facts. V.J. (convicted

DTO member Manjaro Johnson's brother) was not the only person White

purchased a one-way flight for from Los Angeles to a DTO distribution hub. V.J.

also flew with M.G., who flew with multiple co-conspirators to cities related to the

DTO's drug activity before DEA disrupted the organization. Some examples: M.G.

also flew with Andre Scott from Los Angeles through Dallas Fort Worth to Detroit

in November 2016; and Manjaro Johnson from Los Angeles to Detroit in May and

August 2017; not only that, but M.G. also paid for James McGlory's flight from

Detroit to Los Angeles in April 2017. As early as October 2016, M.G. flew from

Los Angeles to Detroit (paid for by James McGlory's wife V.W. who was also

listed under the reservation's contact information), and from Los Angeles to

Baltimore in January 2017[3] (with a different, but similar contact name, but the

same number for listed for V.W.'s in October 2016). (Gov. Ex: 2: Chart of M.G.

---

[3] M.G. flew with J.K. Of note, J.K. also flew with Tyler Jackson from Baltimore to
Las Vegas on October 22, 2016. (Gov. Sealed Ex. 3: Flight Records)

Flights; Gov. Sealed Ex. 3: Flight Records).

The fact that V.J. and M.G. were not indicted or specifically named in the affidavit does not detract from the affiant's reference to them as DTO members. What was clear from the informants and the financial investigation is that McCoy's recording studio Another Level and his promotional business MGMC were inextricably intertwined with his drug trafficking. DEA-1 identified Another Level as a place where members of the DTO gathered to discuss drug trafficking operations. (Ex A: iCloud Warrant ¶ 22). DEA-3, an acknowledged drug conspirator, admitted meeting McCoy there. (*Id*. ¶ 24). DEA-4 said drug traffickers visited the studio. (*Id*. ¶ 25). In addition to identifying Another Level, DEA-2, DEA-3, and DEA-4 were also familiar with the use of MGMC in some iteration as a reference to the drug organization, not just a legitimate business, as was DEA-5. (*Id*. ¶¶ 23-25, 27).

In light of the totality of the information, not naming V.J. and his association with MGMC as an artist, is not a "material omission" because inclusion of those two facts were not essential to the magistrate's probable cause determination. The same is true of White's communications with Scott and Jackson.

## C.    White's communication with others (iCloud affidavit)

The affidavit fairly described White's communication with other identified DTO members, including Andre Scott, who agents arrested at the Novi stash

location. Scott's dating relationship with White's relative does not mean that White's communication with Scott is merely innocent, as she implies. (ECF No. 477, PgID. 3480). Nor did the affidavit create a false impression that the communication between White was exclusively about drug trafficking, as White claims. (*Id*.) To the contrary, the affidavit details the nature of two text messages with Scott, one about a hotel reservation, one wishing White a happy birthday. (Ex A: iCloud Warrant ¶ 37).

White's argument also ignores the seemingly invalid sale of the Escalade from Scott to White that previously belonged to one of McCoy's Michigan drug distributors. (Ex A: iCloud Warrant ¶¶ 26, 41). The magistrate could fairly consider the communication between White and Scott as part of the probable cause analysis, but not mentioning that Scott dated White's relative did not amount to a material omission.

The communication as detailed in the affidavit between White and Jackson was likewise not misleading and inclusion of the obscure facts that White offers as an explanation—that they were practically family communicating weeks before Christmas—even if known to the affiant, would not amount to material omissions. White's argument is premised upon a fact not otherwise known to investigators— McCoy and Jackson have children who are related. White's citation to the fact that agents learned Jackson had a child with co-defendant Andria Foster does not help

her argument.

Agents only knew about Jackson and Foster's child because two confidential informants told them. Had an informant not enlightened them, agents would not have known to review their child's birth certificate. (Gov. Sealed Ex. 7: SW 49[4]). White offers no evidence that readily identifies McCoy and Jackson's children's relationship to support her declaration that agents otherwise "should have known" the children are first cousins. (ECF No. 477, PgID. 3481). Furthermore, the argument that McCoy called Jackson "lil bro"—a colloquial term that does not necessarily equate to a familial relationship— in an Instagram post is equally unpersuasive. (ECF No. 477, PgID. 3481; ECF No. 477-3). The affidavit makes this fact clear: McCoy and Jackson had an enduring relationship, having been convicted of trafficking drugs before and resuming their illegal activity together. (Ex A: iCloud Warrant ¶¶ 17-18, 26). Adding in that McCoy and Jackson, and in turn White, had close family ties would not change the probable cause analysis.

### D.    McCoy and White's Residence

The Pala Loma affidavit included some information that was obtained from the execution of the iCloud warrant. Specifically, the Pala Loma warrant described home videos of McCoy and White holding hands while another female declared

---

[4] White cited to SW 44 and SW 49, but did not provide either for the Court's reference. The Government will also provide SW 44 under seal to the Court as Gov. Sealed Ex. 5.

"my big dog, my little dog, you better go through them." And then White leaned into the camera and declared "we the plug." (Ex. E: Residential Warrant ¶ 67). McCoy and White insist that White's declaration is exclusively a reference to their legitimate entrepreneurship and as proof point to a moneygang_mealclique Instagram post from 2016 and a definition from a website. (ECF No. 477-7: Exhibit F). But not offering possible alternative explanations from an on-line Urban Dictionary definition is not a *Franks* omission.

The reviewing magistrate could accept or reject the affiant's interpretation of "the plug," as drug related—a definition McCoy and White acknowledge as valid in their motion. (ECF No. 477, PgID. 3496). But if the term is as widely known to mean a resource for something of value, then not offering an alternative definition did not amount to a material omission. (*Id*. at PgID. 3496-98[5]).

On the whole, McCoy and White attempt to persuade the Court that the

---

[5] In support of their argument that "Plug" could not be about drug trafficking, McCoy and White reference a rap song "I'm the Plug" by Drake, but the lyrics of "I'm the Plug" defies McCoy and White's claim that "it cannot be argued with a straight face that 'the [song] is an acknowledgment from [Drake] of [his] involvement in trafficking drugs.'" (ECF No. 477, PgID. 3497). The song explicitly mentions drugs referring to "a gang of broads riding and they on drugs with me…really I'm the plug." Furthermore, the song features another artist, Future, who is known for rapping about drugs. See https://hiphopdx.com/news/id.37070/title.future-reveals-why-he-always-raps-about-drugs-in-his-music-its-a-catch#; https://www.rollingstone.com/music/music-features/future-the-wizrd-profile-779220/. (Rapper Future worries about the negative influence of his rap songs that glamorized the use of lean).

affiants tried to mislead the magistrates. But a review of the affidavits defies that claim. Rather, the affiants described the informants' criminal histories; noted if an informant provided inconsistent information (as was the case with DEA-2 in both warrants and DEA-4 in the residential warrant); and acknowledged if an informant did not have personal knowledge of any purported facts so the reviewing magistrate could determine how to assess the information and what weight to give it in light of the entire investigation (as was the case with DEA-5 who did not personally know if White maintained contact information for DTO members). (Exhibit A: iCloud warrant ¶ 27).

*Franks* hearings are sometimes granted if an affiant omits critical information bearing on an informant's credibility or implies they had personal knowledge of a fact when they did not. The affiants here did nothing of that nature. The Court should deny McCoy and White's request for a hearing.

## Conclusion

For the above stated reasons, McCoy and White's motions should be denied.

Respectfully Submitted,

Saima Mohsin
Acting United States Attorney

*s/ Andrea Hutting*
Andrea Hutting, P68606
Craig F. Wininger
Assistant United States Attorneys
211 W. Fort St. Suite 2001

Detroit, MI 48226
313-226-9110 phone
andrea.hutting@usdoj.gov

Dated: September 17, 2021

CERTIFICATE OF SERVICE

I hereby certify that on Friday, September 17, 2021, I electronically filed the

foregoing document with the Clerk of the Court using the CM/ECF system which

will send notification of such filing and emailed sealed exhibits to the following:

Allison Kriger
W. Otis Culpepper

*s/Andrea Hutting*
Andrea Hutting
Assistant United States Attorney
