## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | 2:17-CR-20489-TGB-EAS |
| Plaintiff, | HON. TERRENCE G. BERG |
| v. | |
| **MAURICE MCCOY, TEEAUNA WHITE,** et al., | **ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS** |
| Defendants. | |

In this drug conspiracy case, Defendants Maurice McCoy and Teeauna White move to suppress evidence seized as a result of the execution of two search warrants. Eighteen defendants have been charged in connection with the alleged conspiracy, involving a nation-wide heroin, fentanyl, and cocaine distribution ring self-identified as the "Money Gang Meal Clique." The government alleges that Defendant McCoy is the leader of the organization, and that Defendant White is his girlfriend. Several defendants have entered guilty pleas. Currently, McCoy and six others remain charged with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. § 846, while McCoy, White, and three others are charged with Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(h). Defendants McCoy and White challenge two search warrants, the first for data stored in an

1

iCloud account associated with Defendant White and a business operated by her and McCoy, and the second authorizing a search of a home in California that they shared. Defendants move to suppress the evidence obtained from these searches.

Having reviewed the briefing in this case and heard oral argument on the matter, Defendants' motion to suppress and for a *Franks* hearing will be **DENIED**.

## I. BACKGROUND

Defendant Maurice McCoy is accused of leading a wide-ranging drug trafficking organization ("DTO" or "McCoy DTO"). Defendant Teeauna White, McCoy's girlfriend, is accused of helping to maintain the DTO's finances and launder money. Defendant Maurice McCoy is charged with Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. § 846 and Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(h). Defendant Teeauna White is charged with Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. § 1956(h).

In the course of their investigation, the government obtained the two warrants challenged here. The first warrant authorized agents to search an iCloud account that was associated with both the email address "mg.mealclique.ent@gmail.com" and Defendant White's cell phone number. The second warrant authorized agents to search a California residence shared by McCoy and White. As will be discussed below,

2

Defendants allegedly operated or purported to operate a number of businesses, including a music promotion business with an associated recording studio called "Money Gang Meal Clique" ("MGMC"). This name, according to the evidence, was also used by members of the McCoy DTO as the name for their drug operation. The government argues that these businesses were intertwined with the DTO, and were used to conceal DTO proceeds and activity. The central contention of Defendants' motion is that the affidavits in support of these search warrants omitted material facts that would have supported innocent explanations for the suspicious behavior detailed in the warrant applications. In summary, Defendants argue that the affidavits cast several purportedly legitimate businesses as nothing more than fronts for the DTO, failed to provide important context that would explain Defendant White's communications with, and payment of travel expenses for, DTO members, and provided a misleading interpretation of a slang term used by Defendants. Defendants also challenge the reliability of a number of confidential informants relied upon in the affidavits.

## II. LEGAL STANDARD

The Fourth Amendment outlines the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things

to be seized." U.S. Const. amend. IV. The "core" of the Fourth Amendment is the right of a citizen to be "free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041, 150 L. Ed. 2d 94 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). "One of the touchstones of the reasonableness requirement is that the police must generally obtain a warrant based upon a judicial determination of probable cause before entering the home." *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)

Probable cause demands an assessment of whether there is "a 'fair probability,'" given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *U.S. v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991) (quoting *U.S. v. Loggins*, 777 F.2d 336, 338 (6th Cir. 1985)). When evaluating an application and affidavit for a search warrant, the magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

If the affidavit in support of a search warrant "contains a statement, necessary to the finding of probable cause, that is later demonstrated to be false and included by an affiant knowingly and intentionally, or with a reckless disregard for the truth," the search

warrant is invalid. *United States v. Duval*, 742 F.3d 246, 250 (6th Cir. 2014) (citing *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). *Franks* also extends to circumstances in which an investigator intentionally omits evidence in a search warrant affidavit that is "critical to determining the existence of probable cause." *Duval*, 742 F.3d. at 251. Where a criminal defendant makes a "substantial preliminary showing" that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included in a warrant affidavit, a court must hold a *Franks* hearing to determine whether the defendant's Fourth Amendment rights have been violated. *Franks*, 438 U.S. at 155-156.

## III. ANALYSIS

Defendants seek to suppress evidence seized from both warrants. As to the iCloud warrant, Defendants argue that probable cause was lacking because the warrant affidavit included uncorroborated statements from unreliable informants, and that the warrant affidavit was materially misleading because certain facts were omitted. Defendants also argue that the affidavit did not support a finding of probable cause to search the *entire* iCloud account and all categories of data it contained. As to the warrant for the house located at 27622 Pala Loma Court in Moreno Valley, California, Defendants argue that the affidavit in support of the warrant omitted material information rendering it misleading, relied on statements of unreliable informants,

and was stale. Defendants request an evidentiary hearing under *Franks* to address these alleged omissions.

## A. Whether a *Franks* hearing is justified

### i. iCloud Warrant

The first search warrant was issued on April 25, 2019, and authorized the search of an iCloud account associated with the email address "mg.mealclique.ent@gmail.com." iCloud Warrant Aff., ECF No. 477-2, PageID.3508. The account was also tied to Defendant White's cell phone number. *Id.* at PageID.3533-34. The warrant required Apple to disclose account information, copies of emails sent to and from the account, copies of all messages associated with the account, contents of all files stored in the iCloud account, location data, and other logs. *Id.* at PageID.3546-49. Defendants argue that a *Franks* hearing should be held and that evidence seized pursuant to the warrant should be suppressed because the affidavit presented certain information in a fundamentally misleading light that deceived the issuing magistrate. Def's Mot., ECF No. 477, PageID.3480.

The iCloud affidavit is 37 pages long. The first seven pages detail the prior investigation into the DTO, and explain the investigative steps taken up to the point that the iCloud warrant was requested. The affidavit goes on to detail statements made by five confidential informants, and explains how the informants' statements were

corroborated. The affidavit also includes a lengthy "financial investigation" section, which describes the examination of various bank accounts associated with the Defendants. Generally, the affidavit is very comprehensive and detailed.

Defendants do not argue that any of the information presented in the affidavit was strictly untrue. Rather, Defendants argue that the government should have included additional information in the affidavit that it had in its possession. Because Defendants' *Franks* argument rests on omissions, rather than affirmative falsehoods, Defendants face a higher bar. *See United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) ("[the Sixth Circuit has] repeatedly held that there is a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement."). A defendant is entitled to a *Franks* hearing based on alleged omissions "if and only if (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it." *Fowler*, 535 F.3d at 415.

Specifically, Defendants argue that (1) the affidavit suggested that a number of business bank accounts associated with Defendants were mere fronts for the DTO, rather than real operating businesses; (2) the affidavit indicated that White paid for DTO members' travel without

7

explaining that at least one of those purported DTO members was an artist associated with the Money Gang Meal Clique music promotion business; and (3) the affidavit pointed to communications between White and DTO members without also indicating that White had social relationships with those particular DTO members.

### a. The affidavit's "Financial Investigation"

The iCloud affidavit explains that investigators identified several bank accounts associated with White or businesses tied to White and McCoy. iCloud Warrant Aff., ECF No. 477-2, PageID.3523-24.[1] These include business accounts identified as belonging to the entities "Another Level," "Money Gang Meal Clique" ("MGMC"), and "Pretty Pockets," and at least two personal bank accounts. Investigators identified suspicious transactions and usage patterns in all of these accounts. Defendants argue that "perhaps the government's most egregious misrepresentation" is the affidavit's suggestion that MGMC is nothing more than a drug trafficking organization, rather than an active record label and music production and promotion company. Def's. Mot., ECF No. 477, PageID.3483. Chiefly, Defendants fault the affiant's purported conclusion that these accounts were nothing more than "business fronts" and "nominee accounts." *Id.* at PageID.3485.

---

[1] The Court notes that the warrant affidavits at issue here have been filed under seal. However, the affidavits have been extensively cited and quoted at length in both parties' briefs. The Court will only include material cited by the parties in unsealed briefing.

Defendants have provided the court with the affidavit of David Wrublewski, a private investigator retired from the Internal Revenue Service's Criminal Investigation Division. Wrublewski Aff., ECF No. 477-4, PageID.3556. After examining the transaction records associated with the accounts and publicly available Instagram photos, Wrublewski concluded that MGMC, Another Level, and Pretty Pockets "were in fact ongoing businesses that generate[d] revenue and incur[red] expenses—not just names on a bank account used to conceal profits from illegal activities." *Id.* at PageID.3558. Defense counsel also provided the Court with a number of exhibits at the January 11, 2022 hearing on this motion, which the Court has reviewed. See ECF No. 519, PageID.4045-4091. These exhibits consist of Instagram images promoting various MGMC and Pretty-Pockets associated events involving major music artists and support the assertion that MGMC and Pretty Pockets were conducting an event and music promotion business. However, after carefully considering all the information Defendants say the affiant improperly failed to include in the affidavit, the Court concludes that the affidavit still would have supported probable cause, so the affidavit's characterization of the business accounts was not fundamentally misleading.

First, at least some of the information Defendants say was omitted was actually included—the affidavit did not, as Defendants suggest, identify the accounts and associated businesses as nothing more than

9

sham accounts. Instead, the affidavit characterized the recording studio business as an operating recording studio that was intertwined with the DTO's operations. The affidavit disclosed that a confidential informant told investigators that McCoy "owned a recording studio . . . where members of the DTO gather to discuss drug trafficking operations," which agents "later identified . . . as 'Another Level Studio.'" iCloud Warrant Aff. At PageID.3518. Other informants confirmed that McCoy owned a studio called "Another Level." *Id.* at PageID.3519. Another informant "identified 'Another Level Studio' . . . as *a business operated by McCoy*," *Id.* at PageID.3520 (emphasis added), and stated that "members of the DTO would come to the studio that McCoy established." *Id.*

In the "Financial Investigation" section of the affidavit, the affiant explained that when White opened the bank account for "Another Level", she "identified the business as a lounge/restaurant." *Id.* at PageID.3524. The MGMC bank account was set up as belonging to a business called "Moneygang Mealclique Ent." The address on the bank account was shared with "a business named 'Another Level' . . . described as a producing and promotion business." *Id.* at PageID.3524-25. The affidavit did not characterize the accounts as nothing more than mere "nominee accounts." As for the entity "White Way Trucking," the affidavit does not appear to suggest that White Way's accounts were used to launder money. Rather, the affidavit states that investigators received information that White and McCoy "began operating a trucking company

as a business front *to have a legitimate explanation as to the source of their income.*" (emphasis added). *Id.* at PageID.3531.

Even if the affidavit had included an unambiguous statement that Another Level, MGMC, and Pretty Pockets were genuine business that would have generated cash as part of their operations, as the Defendants' expert stated it should have, the affidavit still detailed suspicious transaction histories for all three accounts that would have supported probable cause to believe that they were being used to launder money. That a banking account is used for legitimate purposes as well as money laundering does not preclude a money laundering conviction, nor a finding of probable cause to search for evidence of money laundering. *See United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994).

A review of the "Another Level" account showed that activity "was not consistent with an operating business," because "there were no identifiable expenses related to the operation of a lounge/restaurant and cash flow was not consistent." iCloud Warrant Aff. at PageID.3524. The MGMC account's activity also "was not consistent with the operations of a legitimate business." *Id.* at PageID.3525. It was funded by cash deposits, and "a significant portion of the deposited funds were withdrawn in cash." *Id.* Even more indicative of illicit activity, the Another Level account, MGMC account, and both Pretty Pockets accounts each received $9,500 deposits made on the same day from Baltimore, a DTO hub. *Id.* at PageID.3524-27. These deposits were just

11

under the $10,000 limit that would require the filing of a cash deposit report. Ultimately, Wells Fargo closed all of the accounts for MGMC, Another Level, and Pretty Pockets in late 2017 due to suspicious activity. *Id.* at PageID.3525-26. Mr. Wrublewski's conclusion that it was misleading not to disclose in the affidavit that the cash deposits "could have represented legitimate business income" does nothing to undermine the reasonable conclusion that probable cause existed to believe bank accounts associated with White were used to launder DTO proceeds, and that relevant records would be found in the iCloud account tied to White's phone—based on the fact that (1) multiple $9,500 deposits were made into the accounts on the same day from a DTO hub as detailed in the affidavit, (2) the accounts' transaction records were not consistent with operating businesses, (3) the MGMC bank account and iCloud account bore the same name that informants identified as the gang name of the DTO, (4) all of the accounts were closed for suspicious activity.

### b. The affidavit's discussion of White's travel and paying for the travel expenses of DTO members

The affidavit included a statement that White has traveled with DTO members and paid for other DTO members' travel. The affidavit points out that in March 2017, White paid for a DTO member to fly from Los Angeles to Detroit. iCloud Warrant Aff. at PageID.3523. Defendants argue that including this information was misleading, because the affidavit failed to identify the DTO member for whom White bought

tickets as V.J., an artist associated with the MGMC event and music promotion business, who has not been indicted. This omission does not necessitate a *Franks* hearing because, although V.J. may *also* have been a MGMC artist, the affidavit identified him as a DTO member, his brother is a convicted member of the DTO, he was joined by another DTO member on the trip that White paid for, and multiple informants told investigators that "Money Gang Meal Clique" or MGMC was used as the name for McCoy's DTO, suggesting that MGMC (the music promotion business and recording studio) and the DTO were, as the government argues, "inextricably intertwined." Gov't. Resp., ECF No. 485, PageID.3668.

Courts have repeatedly rejected the notion that an alternate, innocent explanation for suspicious facts vitiates probable cause. *See, e.g., United States v. Bosyk*, 933 F.3d 319, 327 (4th Cir. 2019)("Probable cause, as the Supreme Court has reiterated time and again, does not require officers to rule out a suspect's innocent explanation for suspicious facts.")(internal marks and citation omitted); *United States v. Ejiofor*, 753 F. App'x 611, 615 (10th Cir. 2018)("We should be reluctant to disturb a magistrate judge's probable cause determination merely because facts supporting a search warrant are susceptible to alternative, innocent explanations."); *United States v. Falso*, 544 F.3d 110, 128 (2d Cir. 2008) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause. Neither should it preclude a

good faith belief in probable cause.")(citation omitted). When considering the totality of the circumstances, even if the affidavit had disclosed that V.J. was an artist associated with MGMC, the magistrate judge's finding of probable cause would not be undermined.

### c. White's communications with Jackson and Scott

The affidavit also describes communications between White and DTO members Tyler Jackson and Andre Scott. iCloud Warrant Aff. at PageID.3527-28. The affidavit detailed the contents of White's texts with Scott, which did not reference DTO activity.

As to the communications with Scott, Defendants argue that it was misleading for the affiant not to include the fact that Scott was in a romantic relationship with Teeauna White's relative, Nikiesha White. Def's Mot. at PageID.3480. As to the communications with Jackson, Defendants argue that Jackson and McCoy have an "almost-familial relationship" and have children who are first cousins, and thus White could have been communicating with Jackson for personal rather than drug-trafficking-related reasons. Def's Mot. at PageID.3481. Defendants argue that failing to include this information left the magistrate with the false impression that White could only have been communicating with Scott and Jackson in the context of alleged drug trafficking.

These alleged omissions do not merit a *Franks* hearing. First, the affidavit did in fact provide important context about the White-Scott messages: that the messages were not related to drug trafficking in

14

nature, and instead were entirely personal. iCloud Warrant Aff. at PageID.3528. Moreover, even if the evidence of a personal relationship had been included, it does not necessarily undercut a finding of probable cause, as *Franks* requires. First, as discussed above, the existence of a possible alternative innocent explanation for a suspicious fact does not undermine a finding of probable cause. And additionally, the affidavit also included other information suggesting a criminal connection between White and Scott: a potentially illegal vehicle sale in which White purported to purchase a vehicle—which had previously been owned by another DTO member—from Scott while Scott was incarcerated, and in which Scott's signature on the title transfer appeared to be forged. *Id.* at PageID.3529-30.

For all these reasons, neither the financial investigation, nor presentation of information concerning White's purchase of airline tickets, nor the inclusion of White's communications with Jackson and Scott allegedly without the proper context are sufficient to justify a hearing under *Franks*.

### ii.  Residence Search Warrant

The second warrant being challenged was issued on May 30, 2019, and authorized a search of 27622 Pala Loma Court, a California residence shared by Defendants White and McCoy ("Residence Warrant"). Like the iCloud affidavit, the Residence Warrant affidavit is lengthy and comprehensive. In the course of some 51 pages, the affidavit lays out the

entire investigation into the McCoy DTO in great detail, the investigative steps that led up to the warrant application, the prior financial investigation, and many other details. Defendants argue that the warrant included the affiant's fundamentally misleading interpretation of certain facts, and omissions of other potentially exculpatory facts. In addition to the arguments about the financial investigation detailed in both affidavits, which the Court has concluded was not misleading, Defendants challenge the inclusion of the affiant's opinion about the meaning of the word "plug," and the failure to include Defendant McCoy's recent location history.

### a. Definition of "plug"

The affidavit in support of the Residence Warrant included reference to a video that was seized from the iCloud account discussed above. In the video, White makes the statement "we the plug" while holding McCoy's hand. The affiant stated: "I know from my training and experience that 'plug' is a common term for a source of supply in drug trafficking. I believe the video is an acknowledgement from both, but particularly [White] of their involvement in trafficking drugs." Residence Warrant Aff., ECF No. 477-6, PageID.3609.

Defendants concede that "plug" "can refer to a drug dealer" depending on the context. Def's. Mot. at PageID.3496. But Defendants argue that the word has another meaning: someone who is able to help obtain something that would otherwise be difficult to get—in this case

16

commercial popularity and success in the music industry. Defendants argue that it should have been clear to investigators that this is what White meant, because on at least one occasion, the MGMC Instagram account posted a picture of the MGMC/Another Level recording studio with the caption "we are own plug." Instagram image, ECF No. 477-7, PageID.3627.

For several reasons, this argument fails to persuade. First, the challenged statement in the affidavit is clearly framed as the affiant's opinion: "*I believe* the video is an acknowledgment . . . of their involvement in drug trafficking." Residence Aff. at PageID.3609 (emphasis added). It is well established that a reviewing magistrate judge is entitled to give "considerable weight" to the conclusions of experienced law enforcement investigators as to where and in what form evidence may be found. *United States v. Lawson*, 999 F.2d 985, 987 (6th Cir. 1993). Second, as Defendants concede, the affiant's opinion as to the meaning of "plug" is in fact a commonly accepted definition. Def's. Mot. at PageID.3496. Third, at least one other district court has rejected a similar challenge to a search warrant application premised in part on an affiant's interpretation of a defendant's statements. *See United States v. Briggs*, No. 2:20-CR-00206-JMG, 2021 WL 915940, at *19 (E.D. Pa. Mar. 10, 2021)(rejecting the argument that inclusion of an affiant's opinion as to the meaning of a defendant's Instagram videos justified a *Franks* hearing). Fourth, it is not clear that the Instagram image of the recording

17

studio to which Defendants point even contradicts the affiant's definition—the affidavit provides probable cause to believe that the MGMC/Another Level recording studio was effectively synonymous with the DTO—multiple informants said members met there, the DTO shared the same name, and the MGMC and Another Level bank accounts appear to have been used to conceal DTO proceeds. For these reasons, the affiant including this definition of "plug" does not merit a *Franks* hearing.

### b. Location data

Defendants argue that the affidavit omitted exculpatory location data, which would have showed that McCoy had neither "visited any stash houses or distribution locations," nor met with "criminal associates" in the 60 days preceding the warrant application. Def's. Mot. at PageID.3499. The government responds that, by this stage of the DTO's operations, McCoy was no longer participating in the "grunt work" of delivering or distributing drugs. Gov't. Resp. at PageID.3664. In turn, Defendants reply that this argument is inconsistent with the fact that the government applied for a warrant to obtain the very location data at issue—a warrant to track two cell phones suspected to belong to McCoy and White, in which the affiant stated that the location data would aid in locating stash houses and distribution locations. Def's. Repl., ECF No. 500, PageID.3926-27.

The Court has reviewed that affidavit. While the affiant does indicate that tracking both phones will aid in identifying stash houses

and distribution locations, that is merely one of a number of justifications. The warrant affidavit states that location data "will aid in confirming the identity of [McCoy] and [White as the phones' users] . . . *as well as* identifying additional co-conspirators, locations of stash houses, distribution locations, and the residences of co-conspirators[.]" Location Data Warrant Aff., ECF No. 499, PageID.3903. The Court finds no inconsistency between that warrant application—the primary purpose of which seems to be to confirm that White and McCoy are indeed the users of the cell phones in question—and the government's proffered justification for why the location data revealed no direct evidence of McCoy visiting drug distribution locations or stash houses.

In any event, a *Franks* hearing is not required merely because the affidavit does not mention that the location data revealed no direct evidence of drug dealing. As discussed above and as the Sixth Circuit and other courts in this district have explained, "[t]here is no requirement that all potentially exculpatory information be included in the search warrant affidavit." *United States v. Sample*, No. 11-20386, 2012 WL 715880, at *5 (E.D. Mich. Mar. 6, 2012); *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998)("to require that all potentially exculpatory evidence be included in an affidavit, places an extraordinary burden on law enforcement officers, compelling them to follow up and include in a warrant affidavit every hunch and detail of an investigation in the futile attempt to prove the negative proposition that no potentially exculpatory

19

evidence had been excluded."). And moreover, if this information had been included, it would not have undermined probable cause.

For the reasons discussed above, neither the inclusion of the affiant's definition of "plug" nor the omission of the location data justifies a hearing under *Franks*.

### B. Whether the warrant affidavits were supported by probable cause and the informants reliable

Having determined that the neither the iCloud warrant affidavit nor the Residence warrant affidavit omitted critical information or context, and that no *Franks* hearing is required, the Court now considers whether the affidavits were sufficient to establish probable cause.

The affidavits detailed numerous drug seizures and arrests involving the DTO. They included statements from informants that McCoy led the DTO, and that White was intimately involved in its operation. They included evidence sufficient to establish probable cause to believe that McCoy and White used various business accounts, including the Money Gang Meal Clique account, to conceal the DTO's proceeds. Multiple informants identified the DTO by name as "Money Gang Meal Clique," or by variations of that name. The affidavits included facts suggesting that McCoy and White resided at the Pala Loma residence, and an informant's statement that McCoy kept DTO proceeds there. As for White personally, the affidavit stated that White communicated with members of the DTO, paid for their travel, purchased

20

at least one vehicle from a DTO member in what appears to be an illegitimate or fraudulent transaction, and was tied to multiple bank accounts with suspicious transactions suggestive of money laundering. Multiple informants described White as a participant in the DTO. All of this, taken together, is enough to establish probable cause to believe that evidence and proceeds of drug trafficking and money laundering would be found by searching the iCloud and residence at issue here.

To the extent Defendants challenge the issuing magistrate judges' probable cause determinations—beyond the *Franks* arguments the Court has already rejected—they mainly target the reliability of the confidential sources cited in the warrant affidavits. Where an affidavit includes information derived from a confidential source, a court must consider "the veracity, reliability, and the basis of knowledge for that information as part of the totality of the circumstances analysis." *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006). As the Supreme Court has explained, these elements are not "independent requirements to be rigidly exacted in every case," but instead are "closely intertwined issues that may usefully illuminate the commonsense, practical question" of whether probable cause exists to believe contraband or evidence may be found in a particular place. *Illinois v. Gates*, 462 U.S. 213, 230 (1983). A deficiency in either reliability or basis of knowledge "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* at 233.

21

Defendants rely heavily on *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005), in which the Sixth Circuit rejected a warrant affidavit that contained "no averments" about several informants' historical reliability, nor any evidence that the informants' identities were disclosed to the magistrate. But while it is true that the affidavits here did not affirmatively state that any of the informants were reliable and the informants' identities were not disclosed, *Frazier* is distinguishable because the *Frazier* affidavit *also* did not include any evidence that the informants' statements were corroborated—unlike the affidavits here, which include significant corroboration.

First, each of the *five* informants referenced in the affidavit provided information that was consistent with one another, buttressing the reliability of all five. *See, e.g., United States v. Alford*, No. 16-CR-20003-SHL, 2016 WL 10922897, at *4 (W.D. Tenn. June 17, 2016), *aff'd*, 717 F. App'x 567 (6th Cir. 2017)(warrant was supported by probable cause where "[t]he affidavit . . . contained multiple anonymous tips reporting previous drug activity at [d]efendant's residence and a named informant describing a drug transaction at the same location close in time to the submission of the affidavit."); *United States v. Taylor*, No. 1:07CR68, 2007 WL 1115194, at *7 (N.D. Ohio Apr. 13, 2007), *aff'd*, 471 F. App'x 499 (6th Cir. 2012)("The consistency of each informant's statement with that of the others' indicates the overall reliability of the individual sources."); *United States v. Martinez*, 106 F.3d 402 (6th Cir.

1997)(unpublished table opinion)("Here, there were six separate informants. Two of them had provided reliable information in the past which led to drug seizures. Three had made statements against their penal interests. The six different sources corroborated one another's stories.").

Second, all of the identified informants had a substantial basis of knowledge. All of the informants are current or former members of the DTO, and all described familiarity with its workings. iCloud Aff. at PageID.3517. Each of the informants provided specific details about the manner in which the DTO operated, its structure, and the locations in which it operated. An "explicit and detailed description of the alleged wrongdoing," as the informants provided here, "allows a magistrate to reasonably infer that the informant had gained his information in a reliable way." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999).

Third, as past and current members of the DTO, the confidential informants' admission of their own participation in, and their detailed explanations of, DTO activities were against their own penal interests. The Supreme Court has explained that "[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *United States v. Harris*, 403 U.S. 573, 583 (1971). The Sixth Circuit has clarified that an admission against penal interest is a "significant and *sometimes* conclusive reason for crediting the statements

23

of an informant." *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009)(emphasis in original, internal marks and citation omitted). But even if such admissions against penal interest on their own may not be enough to establish reliability, they provide considerable support to a finding of reliability.

Finally, the affidavits explain that information received from all confidential sources "has been independently corroborated by agents and is deemed to be accurate and reliable." iCloud Aff. at PageID.3517; Residence Aff. at PageID.3589. Throughout, the affidavits highlight how information received from the confidential sources was confirmed. See Gov't. Resp., ECF No. 485, PageID.3651, 3654-56 (summarizing corroboration of informant statements). All of this, taken together, is enough to establish reliability. Defendants also make specific challenges to several of the informants, which are addressed below.

### a. DEA-1

Defendants argue that DEA-1 was anonymous, and that DEA-1 was untruthful at least once in the past. The government explains, in response, that the "DEA-1" who was identified as having been untruthful in a previous search warrant affidavit is a different person than the DEA-1 in this affidavit. Gov't. Resp., PageID.3652-53. While it may be somewhat illogical, as Defendants point out, to identify two different confidential sources by the same pseudonym in the course of a single investigation, this does not undercut the credibility of the source in this

affidavit who is called DEA-1. And while reports from anonymous sources like DEA-1 "demand more stringent scrutiny of their veracity, reliability, and basis of knowledge than reports from confidential informants," *United States v. Helton*, 314 F.3d 812, 820 (6th Cir. 2003), the above-discussed corroboration and basis of knowledge are sufficient to establish DEA-1's reliability.

### b. DEA-2

Defendants argue that DEA-2 was untruthful with investigators at least once. The affidavit reveals that DEA-2 initially denied that McCoy was the DTO's leader, but eventually admitted McCoy led the DTO after further questioning. This falsehood does not completely undermine DEA-2's reliability, given that the past falsehood was fully disclosed to the magistrate judge, who could then weigh it along with other information provided by DEA-2 that was corroborated, as well as the fact that DEA-2 had ultimately admitted the lie, in making his own determination of DEA-2's reliability.

### c. DEA-3

Defendants argue that DEA-3 should be not considered reliable because he "could not remember" the name of the DTO in which he allegedly participated. Def's Mot., PageID.3480. However, while DEA-3 "couldn't recall the exact name" McCoy used for the DTO, he indicated that the name "contained . . . 'money gang'" and identified the "Another Level" studio as a place DTO members met to discuss business. iCloud

Aff. at PageID.3519. This minor failure of memory does not undermine DEA-3's reliability.

### d. DEA-5

According to the iCloud affidavit, DEA-5 is a currently-incarcerated member of the DTO who told investigators that he or she "had been told by co-conspirators in 2018" that White "kept phone numbers for members of the DTO in case something happened to McCoy and she needed to resume drug trafficking operations." iCloud Aff., ECF No. 477-2, PageID.3522. Defendants argue that DEA-5 was in custody when co-conspirators supposedly told DEA-5 about White keeping phone numbers of DTO members, but the government included no corroboration, in the form of jail visit logs or call records, that other DTO members gave this information to DEA-5 while DEA-5 was in custody; and that the affidavit does not explain DEA-5's basis of knowledge, or the basis of knowledge of other unnamed co-conspirators who were said to have passed DEA-5 information about White. While it would have strengthened DEA-5's credibility to include such information, its omission does not render DEA-5 unreliable. Other information provided by DEA-5 was corroborated by investigators, and other informants besides DEA-5 identified White as a participant in the DTO: DEA-2 and DEA-3 both told investigators that they knew White was McCoy's girlfriend, and that they believed she had knowledge of the DTO's activities. iCloud Aff. at PageID.3522.

## C. Whether probable cause existed to search every "place" in the iCloud account

Although the Court finds that a *Franks* hearing is not required and that the warrant application was adequately supported by probable cause, Defendants raise another argument: that probable cause did not exist for *each category* of data seized from the target iCloud account. According to Defendants, probable cause was required to search each "place" within the iCloud account—that is, contacts, call logs, text messages, photographs, and the like. Def's Repl., ECF No. 500, PageID.3921. Defendants' argument draws largely on a recent Fifth Circuit decision, *United States v. Morton*, 984 F.3d 421 (5th Cir. 2021).[2] In that case, the Fifth Circuit concluded that the affidavit in support of a warrant to search the phone of a defendant suspected of drug possession established probable cause to search the defendant's text messages, contacts, and call records, but not his photographs. *Id.* at 427. At least one court in this district has applied *Morton* to a search warrant, concluding that a warrant affidavit established probable cause to search some "places" on a defendant's phone, but not others. *See United States v. Chandler*, --- F. Supp. 3d ---, No. 20-20476, 2021 WL 5233289 at *5 (E.D. Mich. Nov. 10, 2021)(Lawson, J.).

---

[2] Shortly after the *Morton* decision issued, the Fifth Circuit agreed to rehear the case en banc and vacated its prior opinion. *See United States v. Morton*, 996 F.3d. 754 (5th Cir. 2021).

27

The *Morton* approach gives the Court pause for two reasons. First, the flight records and banking information sought in this case could be stored or transferred in virtually any file format or storage method—almost any "place" within the account. Second, the approach required in *Morton* would impose difficult to implement rules in every case because, given the fact that even a relatively unskilled computer user can conceal data in virtually any format or location on a device or in a cloud storage account, affiants would be limited to specifying, as places to be searched, those kinds of files or areas that *seem* most likely to contain the sought-after data—even though that data could easily be stored in other places.[3] At the same time, however, the concern that animated the Fifth Circuit in *Morton* is an important one. In any event, the Court need not decide today whether *Morton* should be applied to this case. That is because even if the Court did apply the reasoning of those cases, any evidence seized from "places" for which place-specific probable cause was arguably lacking would still be admitted under the good faith exception to the exclusionary rule.

Where evidence is seized in objectively reasonable reliance on a warrant that is later invalidated, that evidence is still admissible under the "good faith" exception to the exclusionary rule. *U.S. v. Leon*, 468 U.S.

---

[3] *See* Orin Kerr, *Executing Warrants for Digital Evidence: The Case for Use Restrictions on Nonresponsive Data*, 48 Texas Tech L. Rev. 1, 14-17 (2015).

897, 922 (1984). Courts evaluating the good faith exception's applicability consider "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. Hodson*, 543 F.3d 286, 293 (6th Cir. 2008)(internal marks and citation omitted). Here, even if the Court were inclined to apply the logic of *Morton*, a reasonably well trained officer could not have anticipated this novel development in the law of searches and seizures—a development that continues to bedevil courts, as the Fifth Circuit's decision to rehear *Morton* en banc demonstrates. Therefore, even if *Morton* were applied to this case, the good faith exception would apply and allow the admission of any evidence seized from a "place" within the iCloud account for which the iCloud affidavit did not establish specific probable cause to search. And although the good faith exception does not apply where an affiant deliberately misleads an issuing magistrate judge, *Hodson*, 543 F.3d at 292, the affiant did not do so here, as discussed above.

### D. Whether the Residence warrant was based on facts that were stale

Defendant claims that some the facts supporting the probable cause for the Residence warrant are "stale," that is, too old to be reliable in affording a reasonable probability that evidence of a crime was likely to be found. Specifically, Defendants argue that all but one of the confidential informants have been incarcerated since at least 2017, two

years before the warrants issued, and that "all of the drug-related information in the affidavit is one to five years old." Def's. Mot. at PageID.3499. It is well established that stale information cannot be used in the probable cause determination for a search warrant. The staleness inquiry "depends on the inherent nature of the crime." *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)(internal marks and citation omitted). In assessing whether information may be considered "stale," the Sixth Circuit has directed courts to consider "(1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum of convenience or secure operational base?)." *Spikes*, 158 F.3d at 923.

Applying these factors here, the challenged information does not appear to be stale. As to the first factor, the crime alleged is a long-running drug conspiracy spanning several years and multiple states in which it is alleged that Defendant White participated and Defendant McCoy led. Indeed, just two months before the Residence warrant issued, members of the DTO were arrested with distribution quantities of heroin. Residence Aff., ECF No. 477-6, PageID.3586. Such "[e]vidence of ongoing criminal activity will generally defeat a claim of staleness." *United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001). Further, a criminal enterprise of this duration and level of organization would likely

30

maintain records, keep proceeds, and possess other evidence for a reasonably long period of time, like a business does. Finally, investigators identified photographs of both Defendants with large quantities of cash and jewelry taken just months before the Residence warrant issued. Residence Aff. at PageID.3611.

As to the second factor, location data established both Defendants' cell phones were "consistently" present at the residence during the two months immediately preceding the execution of the warrant. *Id.* at PageID.3618. As to the third, the warrant sought records, jewelry, cash, and other proceeds of drug trafficking. These are the sort of items "of enduring utility" likely to be retained for a long time. *See, e.g., United States v. Mills*, 357 F. Supp. 3d 634, 651 (E.D. Mich. 2019)(noting the "enduring utility" of drug ledgers, photographs depicting drug trafficking activity or proceeds, and other records). As to the fourth factor, the place to be searched was the residence of the DTO's leader—a place where at least one informant stated McCoy stored DTO proceeds. Residence Aff. at PageID.3609-10. This was not a mere "criminal forum of convenience." *See United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009) (holding that a defendant's residence was "clearly a 'secure operational base.'" For all these reasons, the facts set out in support of the Residence warrant were not stale.

## IV. CONCLUSION

This is not "the very rare case where the defendant makes a strong preliminary showing that the affiant with an intention to mislead excluded critical information from the affidavit, and the omission is critical to the finding of probable cause." *Mays v. City of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998). While Defendants' alternative explanations and the contextual background they offer to cast the evidence in a more favorable light may be relevant to the jury's determination of guilt or reasonable doubt, they are not sufficient to meet the substantial preliminary showing necessary to justify a *Franks* hearing, as there are still ample facts supporting probable cause. A *Franks* hearing is therefore not warranted and the evidence seized need not be suppressed. For the foregoing reasons, Defendants' Motion to Suppress (ECF No. 477) is **DENIED.**

**SO ORDERED.**

Dated: February 18, 2022     s/Terrence G. Berg
                              TERRENCE G. BERG
                              UNITED STATES DISTRICT JUDGE